Filed 4/4/16  P. v. Morales CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069286 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVA801274) |
| MARLON ALBERTO MORALES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Gregory S. Tavill, Judge.  Affirmed.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

Marlon Alberto Morales admitted at trial that he fatally shot his wife, Yecenia Morales (Yecenia),[1] in the head while she was sleeping, but he claimed the handgun he used in shooting her accidentally fired as he was pulling it out from under the pillow on which she was sleeping. As discussed, *post*, the prosecution presented evidence under Evidence Code[2] sections 1101, subdivision (b) (hereafter section 1101(b)), 1109, and 352 of Morales's prior abuse of both Yecenia and his former girlfriend, Genevive Noriega. Expert testimony, which Morales does not challenge, established that (1) to be fired, the gun had to be cocked and the trigger pulled with five pounds of pressure; and (2) the tip of the barrel of the gun was touching the skin on the side of Yecenia's head when it was fired.

A jury found Morales guilty of first degree murder (Pen. Code, § 187, subd. (a)), and found to be true allegations that he personally and intentionally discharged a firearm proximately causing death within the meaning of Penal Code section 12022.53, subdivision (d), and that he personally and intentionally discharged a firearm within the meaning of Penal Code section 12022.53, subdivision (c). The court sentenced Morales to a total state prison term of 50 years to life.

Morales appeals, contending (1) the court prejudicially abused its discretion and violated his due process right to a fair trial by admitting under sections 1101(b), 1109,

---

[1]    Because Morales and his wife shared the same last name, we refer to his wife by her first name. We also refer to others sharing the same last name in the same manner for clarity and ease of reference.

[2]    All further statutory references are to the Evidence Code unless otherwise specified.

and 352 the testimony of seven witnesses showing he had committed uncharged prior acts of domestic violence against Yecenia; (2) section 1109, as applied in this case, violated his right to due process under the Fifth and Fourteenth Amendments; and (3) the court prejudicially erred and violated his federal constitutional right to due process in instructing the jury because the instructions it gave under CALCRIM Nos. 375 and 852 were "flawed under the facts of this case" in that the prior-bad-acts testimony of the seven witnesses that was admitted under sections 1101(b), 1109, and 352 "described actions that did not constitute 'abuse' or 'domestic violence' under the instructions provided to the jury." We affirm the judgment.

## FACTUAL BACKGROUND

A. *The People's Case*

1. *Genevive Noriega's testimony* (*the admissibility of which Morales does not challenge on appeal*) *regarding uncharged prior incidents of domestic violence*

Morales's former girlfriend, Genevive Noriega, testified about their on-and-off relationship, including her moving in with Morales and having a baby with him. She testified that Morales "had a lot of girls on the side," which was a "problem" for her, and as a result they were "always breaking up, [and] getting back together." Morales was jealous and controlling, and he would get mad if she left to go to the store or anywhere else.

Noriega indicated that the first time Morales was violent towards her occurred after she found out he had been unfaithful and she tried to break up with him. Morales grabbed her, pulled her into his apartment, and "tossed" her around and against the wall

3

about five times.  She suffered bruises on her face, and one of her shoes flew off.

Morales yelled at her to go into a room and Noriega ran crying into the room.  Morales's

apartment was "weird" in that the door of that room could be locked from the outside but

not from the inside.  Noriega testified Morales locked her into the room and, a couple of

minutes later, he entered the room and grabbed a shotgun from under his bed.  As she

was crying, Morales began loading his shotgun and said, "Just get out of here before I

hurt you."  Noriega ran out of the apartment with only one shoe on and drove to her

mother's home where she lived.  Morales later apologized, they reconciled, and Noriega

moved out of her mother's home and began living with Morales at his request.

Another time, when Noriega was pregnant, Morales became angry, grabbed her,

and was going to hit her, but he calmed down when she reminded him she was pregnant.

Noriega also testified that when she was five months pregnant, she left Morales

and moved in with her parents.  One day Morales chased her as she was driving away

from a party, followed her to her parents' home, pounded on the door, and told her father,

"I know she's here.  Get her out here."  Morales said he was going to "get" her.  Morales

left when Noriega's father said he would call the police if Morales did not leave.  Later,

Noriega again reconciled with Morales.

Noriega also testified that, after she had the baby, Morales would get angry if she

did not have sex with him every other day, and he would punch walls and throw chairs.

On one occasion, when Noriega told Morales, who had friends over, to be quiet because

the baby was sleeping, Morales punched her in the nose, causing it to bleed.

4

On another occasion when Morales picked Noriega up from work, she was five minutes late and Morales punched her in the face with a closed fist in the car, cutting her lip. Another time, Morales "flipped out" because Noriega was putting on makeup, and he threw her makeup down the hallway. As she was picking it up, Morales, who was wearing cowboy boots, kicked her thighs three times.

Noriega also testified that when she worked at a makeup counter in a mall, Morales would not allow her to go to the mall for any reason other than to go to work. After they broke up the final time, Noriega had lunch at Nordstroms. Morales found the receipt and "flipped out." Noriega told Morales he was crazy, and then she told him to get away from her. Morales tried to punch her and he broke her middle finger when she covered her face with her hands. Noriega's father called the police. The parties stipulated that on December 22, 1999, Morales was convicted of felony infliction of corporal injury upon Noriega in violation of Penal Code section 273.5.

2. *Uncharged prior incidents of domestic violence against Yecenia*

a. *Testimony Morales does not challenge on appeal*

The prosecution presented evidence that Morales had an abusive on-and-off relationship with his wife, Yecenia. Yecenia's mother, Arcelli Jaime (Arcelli), testified that Yecenia would live with her about once a month for a few days. On multiple occasions, Arcelli noticed that Yecenia had bruising on her legs, thighs, and arms. Arcelli testified that Yecenia had a black eye after Morales "beat her up really bad one time." Yecenia's father photographed her black eye, and the photograph was admitted into evidence.

5

Arcelli also testified that, in 2007, she and Yecenia's father confronted Morales about his having hit Yecenia. Arcelli told Morales to never ever hit her daughter again. Morales responded by threatening Arcelli and her whole family, and he said he would kill them and "fuck your family up." Yecenia and her children moved out of the home she shared with Morales the day her parents confronted him, and she lived with them until Morales killed her. In March 2008 Yecenia filled out court documents to obtain a restraining order against Morales. However, in early July of that year, Morales moved in with Yecenia at her parents' house.

Yecenia's aunt, Martha Quintero (Quintero), testified that a year before the murder, Morales told her, in front of Yecenia, that he slept with a gun under his pillow. Morales told Quintero he was going to use the gun.

Morales and Yecenia's daughter, Destiny Jaime (Destiny), testified that, on one occasion when Morales and Yecenia were arguing, Morales asked his son, Giovanni Morales (Giovanni), to get a gun. She followed her half-brother, Giovanni, as he went outside, retrieved a gun from the rose bushes, and gave it to Morales. Destiny saw Morales point the gun at Yecenia while Morales and Yecenia were arguing. Destiny also testified that, on different occasions, she saw holes punched in the walls after Morales and Yecenia argued. On two different occasions she saw that Yecenia had a black eye.

Johanna Cortez (Johanna), one of Yecenia's cousins, testified that, about four years before Morales killed Yecenia, she (Johanna) was at the house with Yecenia and Morales when she heard a lot of banging, yelling, and screaming from a room upstairs; she also heard Yecenia yelling, "Stop. Stop." It lasted 15 to 20 minutes. Yecenia came out of the

6

room shaking and crying, and she had red marks on her face and upper arms. As Johanna headed downstairs, Morales approached her with a very angry face. Yecenia pushed Johanna down the stairs to hurry her up and stood between Johanna and Morales. Morales then pushed Yecenia out of the way by "ramm[ing]" her. Johanna testified that she ran outside to a truck, Yecenia walked fast behind her, and Morales followed them. Morales grabbed Yecenia by her neck, picked her up, and held her about four inches off the ground as Yecenia was kicking her feet. Johanna got into the truck and closed the door because she was scared. Morales put Yecenia down when a neighbor came by. A friend of Morales came out of the house, told him to stop, and also told him the police were coming. Yecenia got into the truck with Johanna. Johanna testified that Yecenia was shaking and looked like she had "gotten through a really bad fight."

Martin Gonzalez, who also worked with Yecenia, saw Morales push Yecenia and act violently towards her at a dancing hall in Los Serenos where office parties were held.

b. *Testimony of seven witnesses that Morales challenges on appeal*

i. *Enrique Jaime*

Yecenia's brother, Enrique Jaime (Enrique), testified he stayed at Yecenia and Morales's house. He heard Morales hit Yecenia, and he heard her loudly saying, "Let me go" and "The kids are upstairs." Enrique testified it sounded like Morales was "having her against the wall," because he heard the wall "thumping." Enrique testified this happened "at least three times" when he was there. Enrique also testified he heard Morales swearing at Yecenia, calling her a "bitch," and yelling at her to "shut up," to "shut the fuck up" and "mind your own fucking business." The next day, Enrique would

7

see red marks on Yecenia's neck, bruises on her arms, and swelling in her eyes from crying. Enrique also testified he once he saw her with a black eye in 2008.

### ii. *Joaquin Jaime, Jr.*

Yecenia's other brother, Joaquin Jaime, Jr. (Joaquin), testified that Morales once called him because he was looking for Yecenia. Morales was very aggressive and upset. Joaquin told Morales he did not know where Yecenia was, and Morales reacted by aggressively saying, "Fucken [(*sic*)] Junior. I know that she's there. You're hiding her." Morales also told Joaquin, "I'm going to go over there. I know she's there."

### iii. *Jaime Jaime*

Yecenia's uncle, Jaime Jaime (Jaime), testified that, a few years before Yecenia's death in 2008, he helped Yecenia move out of a house she shared with Morales in Rancho Cucamonga. Morales took off his shirt and was walking around trying to intimidate them. Jaime confronted Morales about his hurting Yecenia, and Morales responded by saying said he could send friends over to hurt them.

### iv. *Christine Cortez*

Christine Cortez (Christine), another one of Yecenia's cousins, testified that, at a family barbeque in 2005, she saw Morales act violently towards Yecenia by grabbing her by the arm and cursing at her. Morales was very upset and said, "Don't F'n leave me alone. Don't leave me with these F'n people." Morales looked very mean when he said this.

8

v. *Rebecca Torres*

Yecenia was a medical assistant at a medical clinic. Rebecca Torres, a physician who worked with Yecenia there from 2006 to 2008, testified that Morales came to the clinic about five times and argued with Yecenia in the parking lot. Yecenia would return to work upset and crying. Morales would call Yecenia at work and insist on speaking to her. Morales once called the clinic and Torres told him Yecenia was busy with a patient. Morales responded by loudly saying, "That's just not fucking right." Torres told Morales he was not being respectful, and Morales hung up.

vi. *Mercedes Michelina*

Yecenia's supervisor, Mercedes Michelina (Michelina), testified that Morales sometimes called Yecenia at work more than seven times a day. Michelina once answered the phone and told Morales that Yecenia was in the restroom. Morales said, "Don't cover [for] that bitch." Once, after an office luncheon that Yecenia and Michelina attended, Morales waited in the parking lot for Yecenia to return. Morales was very angry with Yecenia, who stayed in the parking lot with Morales. Yecenia was crying when she returned to the office about 30 minutes later. Morales waited for her about three hours until the clinic closed. Yecenia was nervous while Morales was waiting for her there.

vii. *Olga Diaz*

Olga Diaz (Diaz) testified that she worked with Yecenia and was one of her teachers when she was training to be a medical assistant. One day, Morales called Yecenia at work and Yecenia turned on the speakerphone. Diaz testified she "heard them

9

fighting." She also testified that Morales was "talking with [Yecenia] loudly," swearing, and "asking her for money." Yecenia was responding "[n]ervously." Diaz also testified she saw Yecenia at work with a black eye in May 2008.

3. *The murder*

On July 18, 2008, Morales and Yecenia lived in Bloomington with Yecenia's parents, Giovanni, Destiny, and Yecenia's younger children, Michael and Nicholas. On that date, Esmeralda Deleon (Deleon), Yecenia's nine-year-old cousin, was also there. The children ate dinner and then played poker downstairs.

Giovanni testified that Morales and Yecenia argued in the bedroom that evening. Deleon also testified she heard Morales and Yecenia arguing that evening, and she heard Morales say, "It's either you or your family."

Yecenia's parents went into their bedroom, which was downstairs in their tri-level home. Around midnight, Giovanni, Destiny, and Deleon went upstairs to go to sleep in Destiny's room. Yecenia was in her room sleeping. Because Morales had argued with Yecenia, he was in Destiny's room, sleeping on her bed. Destiny tried to wake him up. She then went into her mother's room. Yecenia asked Destiny to stay with her, but Destiny, wanting to go to sleep, went back to her own room where Morales was still asleep in her bed. Destiny woke up Morales, and he went into his and Yecenia's room. Morales was tired and irritated. Giovanni knocked on the door to give Morales his pillow, and Morales did not open it right away. Morales then opened the door about 12 inches, and his forehead was sweating. Giovanni returned to Destiny's bedroom.

10

Giovanni and Destiny saw Morales start the engine of Yecenia's Expedition. Morales then went back to the bedroom. Giovanni went into the hallway, saw Morales holding Yecenia, and also saw blood on the handrail and staircase. Morales carried Yecenia down the stairs, wrapped in a blanket with blood on it, and put her in the back seat of the Expedition. Destiny saw blood in her mother's hair. There was a pillow in front of the house with blood on it. Morales went back into the house and got one or two pillows that he put in the backseat of the car. Giovanni testified that Morales went into Destiny's bedroom, put on cologne, and looked in the mirror. Deleon testified that Morales used napkins to clean the floor in the bedroom he shared with Yecenia, and he walked back and forth between the bedroom and the bathroom across the hall while he was cleaning the bedroom floor. Morales flushed the napkins down the toilet.

Morales got into the Expedition and drove away. He returned five to 10 minutes later. Morales went with the children to Arcelli's bedroom. Destiny was crying and Giovanni was scared.

At around 12:44 a.m. (July 19), shortly after Morales returned, Arcelli woke up, went to the kitchen, and called 911. Arcelli testified that while she was on the phone, she went to the car and saw Yecenia in the car on the floor. Yecenia was white and purple, and she was wrapped in the sheets from her bed. As directed by the 911 dispatch operator, Arcelli and her husband moved Yecenia out of the car and onto the ground. Yecenia had no pulse. Bedding was found on the front seat of the car. Several bloodstains were found at the base of the staircase or front walkway and on the stairs going up to the upper level. A swipe blood stain was found on the banister. A contact

11

blood stain was found on the mattress and bedpost. High energy impact spatter stains were found on the wall and headboard. Morales had contact bloodstains on the front of his shirt and pants, and bloodstains on his hands and palms. There was blood on the barrel of the gun, which was consistent with back spatter and showed the gun was relatively close when shot.

Dr. Glenn Holt, a deputy medical examiner who worked for the San Bernardino County Sheriff Coroner, testified that Yecenia died of a gunshot wound to her head, and he opined that she was lying on her right side on the bed when she was shot. She had an entrance wound on the left side of her head, and a partial exit wound on the right side of her head. Dr. Glen Holt also testified there was unburned gun powder soot along the margins of the entrance wound, some "fine gray material" on the skull "just below it," and a number of scalp tears in different directions caused by the "expanding gasses," all of which was "consistent with a tight contact gunshot wound." The bullet was recovered from the right side of Yecenia's head under the scalp. The medical examiner testified that the tip of the barrel of the gun was touching the left side of Yecenia's head when it was fired.

A .25-caliber Baretta semiautomatic handgun with a magazine containing bullets was collected from Morales. Morales had a spent .25-caliber casing in his right front pocket.

John Johnson, a firearm expert who retired from the San Bernardino County Sheriff's Department as a criminalist, testified that he tested the Baretta handgun and

12

determined that to be fired it had to be cocked and the trigger pulled with five pounds of pressure.

B. *Defense Case*

Morales testified and admitted he was abusive towards Yecenia. He said the first time he assaulted her was when they were married and she caught him "cheating again." He admitted he was violent towards her "a lot" during their marriage.

Morales also testified that he lost his temper and hit her in the face, giving her a black eye, in March 2008 when Yecenia belittled him. That day, Yecenia and her and her children moved out of their home in Rancho Cucamonga and moved in with her parents in Bloomington. In June, however, Morales's home was being foreclosed on, and he started staying with Yecenia at her parents' home.

Morales further testified that July 18, 2008 was Yecenia's father's birthday. Morales, who had hurt his arm, went upstairs to lie down while the family sang "Happy Birthday" to Yecenia's father. Morales then went to Destiny's room because Yecenia was studying in her room with the lights on. Morales fell asleep while watching a video with his younger children. Later, Destiny, Giovanni, and Deleon came in and Destiny woke him up because she wanted to go to bed. Morales then went back to Yecenia's room.

Morales testified that Yecenia was asleep on his side of the bed, and under the pillow she was sleeping on he had a gun he kept for personal safety. Morales also testified that he reached under the pillow to pull the gun out and tried to nudge Yecenia aside. He further testified that, as he was "pulling the gun from under the pillow," Yecenia "woke and she startled back," and "the next thing [he] rememb[ered] after that

13

was hearing the gun go off." He looked at Yecenia and saw blood coming out of the side of her head. Morales picked up the gun and spent shell casing and then put them in his pocket. He picked Yecenia up and carried her out. He was going take her to the hospital and put her in the back of the car with blankets and pillows. On his way to the hospital, he called his mother and asked her to pick up Giovanni, because there had been an accident and his wife had been shot.

Morales testified that he then panicked, "turned back around and pulled back into the driveway." He got out, ran back into the house, woke up his mother-in-law, and, when he told her what happened, she called 911. He denied that he and Yecenia were having an argument when the gun fired, and he testified that he did not shoot her on purpose.

Morales admitted he "cheated" on Noriega "a lot," and he would lose control and hit her when she would get really upset and throw things. He admitted he was arrested and pleaded guilty to a domestic violence charge after he broke Noriega's finger when he tried to hit her and she attempted to block him with her hand. He also admitted he went on to commit domestic violence against his wife, Yecenia, multiple times.

## DISCUSSION

I. *ADMISSION OF PRIOR BAD ACT TESTIMONY OF SEVEN WITNESSES*

Morales first contends the court prejudicially abused its discretion and violated his due process right to a fair trial by admitting under sections 1101(b), 1109, and 352 the testimony of seven witnesses showing he had committed uncharged prior acts of

14

domestic violence against Yecenia.  We reject this contention because any evidentiary error was harmless under any standard of prejudice.

A.  *Applicable Legal Principles*

1.  *Section 1101*

"Subdivision (a) of section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).)  Thus, evidence of other crimes or bad acts is generally inadmissible when it is offered to show a defendant had the criminal disposition or propensity to commit a charged crime.  (*Ibid.*)

Section 1101(b) "clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition."  (*Ewoldt*, *supra*, 7 Cal.4th at p. 393, fn. omitted.)  Specifically, section 1101(b) provides in part:

> "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act."

2.  *Sections 1109 and 352*

Section 1109 generally authorizes the admission of evidence of a defendant's commission of other acts of domestic violence in a criminal action in which the defendant is charged with an offense involving domestic violence.  (*People v. Poplar* (1999) 70

15

Cal.App.4th 1129, 1138.) Specifically, subdivision (a)(1) of section 1109 (hereafter section 1109(a)(1)) provides (with exceptions not applicable here):

> "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

Thus, section 1109 creates an exception to the general rule, codified in subdivision (a) of section 1101, precluding admission of uncharged misconduct to show that the defendant had a propensity to commit crimes. (§ 1109(a)(1).)

The term "domestic violence" is broadly defined for the purposes of section 1109 as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." (Pen. Code, § 13700, subd. (b); Evid. Code, § 1109, subd. (d)(3).) The term "abuse" is defined for purposes of section 1109 as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subd. (a).)

Under section 352, evidence is properly excluded if its probative value is "substantially outweighed" by the probability that its admission will necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (§ 352; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.) Thus, the trial court has discretion to exclude evidence of prior acts of domestic violence if the probative value is substantially outweighed by the probability its admission would

16

necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (§§ 1109, subd. (a)(1), 352; *Cudjo*, at p. 609.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

3. *Standards of review and prejudice*

The admissibility of evidence of prior acts of domestic violence as propensity evidence under sections 1109 and 352 "is subject to the sound discretion of the trial court, which will not be disturbed on appeal absent a showing of an abuse of discretion." (*People v. Poplar*, *supra*, 70 Cal.App.4th at p. 1138.) A trial court's rulings under section 1101 are also reviewed on appeal for an abuse of discretion. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.)

"[T]he court's exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently absurd manner that

17

resulted in a manifest miscarriage of justice." (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.)

Error in admitting evidence of a defendant's prior acts of domestic violence as propensity evidence under section 1109 is subject to the *Watson*[3] standard of prejudice. (See *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1145 [any error in admitting uncharged act of domestic violence was harmless under *Watson*].) Under the *Watson* test, the trial court's judgment may be overturned on appeal only if the defendant shows "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.) Probability under *Watson* "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918 (*Ghilotti*).)

B. *Analysis*

In contending the court prejudicially abused its discretion and violated his due process right to a fair trial by admitting under sections 1101(b), 1109, and 352 evidence that he committed prior acts domestic violence against Yecenia, Morales challenges the admissibility of "all or part" of the testimony given by the following seven prosecution witnesses: (1) Enrique Jaime, (2) Joaquin Jaime, Jr., (3) Jaime Jaime, (4) Christine Cortez, (5) Rebecca Torres, (6) Mercedes Michelina, and (7) Olga Diaz. The testimony of these witnesses is summarized, *ante*, in the factual background.

---

3        *People v. Watson* (1956) 46 Cal.2d 818, 836.

Morales does not challenge the admissibility of the testimony (also summarized, *ante*) of Genevive Noriega (his former girlfriend), Arcelli Jaime (Yecenia's mother), Martha Quintero (Yecenia's aunt), Destiny Jaime (Morales and Yecenia's daughter), Johanna Cortez (one of Yecenia's cousins), and Martin Gonzalez (one of Yecenia's coworkers).

We need not address Morales's many claims of evidentiary error concerning the court 's admission of the seven witnesses' challenged testimony because, even if we were to conclude the court erred by admitting that testimony, we would also conclude any such error was harmless under the applicable *Watson* harmless error standard because Morales has failed to show on the facts of this case that it is reasonably probable a result more favorable to him would have been reached absent such error.[4] Disregarding the challenged testimony, we conclude the evidence supporting Morales's conviction of first degree murder and the jury's true findings on the firearm enhancement allegations is so overwhelming that Morales has not shown, and cannot show, a "reasonable chance" (*Ghilotti*, *supra*, 27 Cal.4th at p. 918) he would have obtained a more favorable outcome in the absence of the claimed errors. Morales admitted at trial that he shot and killed Yecenia. Morales's son, Giovanni, testified that Morales and Yecenia had argued in the bedroom during the evening before Morales shot her. One of Yecenia's cousins, Esmeralda Deleon, also testified she heard Morales and Yecenia arguing that evening,

---

4     Although the Attorney General asserts Morales forfeited some of his claims of evidentiary error, in the exercise of this court's discretion, we reach the merits of Morales's claim that he suffered prejudice.

and she heard Morales say, "It's either you or your family." Overwhelming evidence refuted Morales's testimony that the gun somehow discharged accidentally. Morales testified that he "hear[d] the gun go off" when he started to pull it out from under the pillow on which Yecenia was sleeping. However, the unchallenged testimony of the prosecution's firearm expert established that the gun in question, to be fired, first had to be cocked, and then the trigger had to be pulled with five pounds of pressure. The unchallenged testimony of the medical examiner established that the tip of the barrel of the gun was touching the *skin* on the side of Yecenia's head when it was fired. The prosecution's unchallenged evidence established that no pillow with a bullet hole in it was found.

Morales does not challenge the voluminous body of evidence, apart from the challenged testimony of the seven witnesses, establishing he had committed numerous prior acts of domestic violence against Yecenia and Noriega. Morales admitted at trial that he had committed domestic violence against them. Morales does not challenge the admissibility of (1) Arcelli's testimony that Yecenia had a black eye after he "beat her up really bad one time," and that he had threatened to kill her and her family and "fuck [them] up" after she and Yecenia's father confronted Morales about his hitting Yecenia; (2) Quintero's testimony that he told her he was going to use the gun he kept under the pillow; (3) Destiny's testimony that she had seen him point the gun at Yecenia while he and Yecenia were arguing; and (4) Johanna's testimony that she witnessed an incident during which she heard she heard a lot of banging, yelling, and screaming from Yecenia's room, including Yecenia's yelling, "Stop," then saw that Yecenia had red marks on her

20

face and upper arms, and then watched as Morales picked Yecenia up by her neck and held her about four inches off the ground as she was kicking her feet;

Morales also does not challenge Noriega's testimony that (1) he was jealous and "really controlling," and he would get mad if she left to go to the store or anywhere else; (2) she suffered bruises when he grabbed her, pulled her into his apartment, and "tossed" her around and against the wall about five times after she found out he had been unfaithful and she tried to break up with him; (3) he grabbed a shotgun and began loading it when she was crying, and then told her, "Just get out of here before I hurt you"; and (4) he tried to punch her and broke her middle finger when she covered her face with her hands. Stipulated evidence established that, as a result of this incident in which he broke Noriega's finger, Morales was convicted of felony infliction of corporal injury upon her (Pen, Code, § 273.5).

In light of the foregoing compelling and unchallenged evidence showing Morales's propensity to commit domestic violence and his guilt, we conclude the court's assumed error in admitting the challenged testimony of the seven witnesses at issue here was harmless even under the harmless error standard announced in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).[5] The admission of the challenged section 1109 propensity evidence did not render Morales's trial fundamentally unfair.

---

[5] Under the *Chapman* standard, a conviction need not be reversed if the People show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24.)

## II. *CONSTITUTIONALITY OF SECTION 1109 AS APPLIED*

Morales next contends that, if "section 352 does not preclude section 1109 from authorizing a defendant charged with murder to be tried based on his character," section 1109 "as applied in this case must violate due process under the Fifth and Fourteenth Amendments to the United States Constitution."[6]  Specifically, he contends the admission of the same challenged "prior bad act" testimony of the seven witnesses discussed, *ante*, violated his federal constitutional right to due process because (1) it was "legally untethered from the probative value for which it was supposedly admitted," (2) the testimony "did not fall under the definitions of 'abuse' or 'domestic violence'," (3) "[t]his meant the jury had a pile of cumulative evidence that was relevant only to make [him] look like a terrible person," (4) the section 1109 propensity evidence "played a significant role" at trial because the prosecutor "explicitly and successfully sought to make the trial one that turned on [Morales's] bad character" and (5) the admission of that evidence was "so unduly prejudicial that it renders [his] trial fundamentally unfair."  He further contends his conviction must be reversed under *Chapman*, *supra*, 386 U.S. 18,[7]

---

[6]     Although the California Supreme Court has not addressed the issue, the Court of Appeal has consistently rejected facial federal and state constitutional due process challenges regarding the admission of propensity evidence under section 1109.  (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 528-529; *People v. Williams* (2008) 159 Cal.App.4th 141, 147; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704; *People v. Price* (2004) 120 Cal.App.4th 224, 240; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095-1096; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1309-1310; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1331-1334; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1026-1027.)

[7]     See footnote 5, *ante*.

because "the government cannot possibly prove the inflammatory, unconstitutional evidence had no effect on the verdict."

These contentions are unavailing. We have already concluded that any error in admitting the challenged testimony of the seven witnesses at issue here was harmless beyond a reasonable doubt under the harmless error standard announced in *Chapman. supra,* 386 U.S. 18, and that admission of that section 1109 propensity evidence did not render Morales's trial fundamentally unfair.

## III. *INSTRUCTIONAL ERROR CLAIM*

Last, Morales contends the court prejudicially erred and violated his federal constitutional right to due process because the instructions it gave under CALCRIM Nos. 375 and 852 (discussed, *post*) failed to guide the jury on how to use the "bad character" testimony of the same seven witnesses (discussed, *ante*) that the court admitted under sections 1101(b), 1109, and 352. He asserts "[t]hese instructions were flawed because the definition of 'domestic violence' did not cover the prior bad act character evidence described by the seven witnesses," which showed he was a "mean, cruel, argumentative person of bad character." He complains that, "[a]s a whole, these instructions told the jury to consider the prior act bad character evidence, but provided no guidance on how to do so." The Attorney General asserts Morales forfeited this claim of error because he "did not object to the instructions as given or request clarifying language." We conclude Morales forfeited this claim of instructional error.

23

A. *The Court's Instructions*

1. *CALCRIM No. 375*

The court gave the following version of CALCRIM No. 375 to the jury:

"The People presented evidence that the defendant previously committed the offense of Infliction of Corporal Injury in violation of Penal Code section 273.5[, subdivision] (a). The People also presented evidence of other acts of alleged domestic violence that were not charged in this case.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant committed the previous offense of Infliction of Corporal Injury and in fact committed the uncharged acts of alleged domestic violence. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely.

"If you decide that the defendant committed the previous offense of Infliction of Corporal Injury and the alleged acts of domestic violence, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:

"The defendant acted with the intent to kill;

"The defendant had a motive to commit the offense alleged in this case;

"OR

"The defendant's actions were the result of mistake or accident.

"Except as may be permitted in Jury Instructions 316 [that a felony conviction can be used to evaluate credibility] and 852, do not consider this evidence for any other purpose.

24

"If you conclude that the defendant committed the previous offense of Infliction of Corporal Injury and the alleged acts of domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crime charged in Count 1, or a lesser crime as to Count 1, or that the allegations have been proven. The People must still prove the charge and all allegations beyond a reasonable doubt."

2. *CALCRIM No. 852*

The court gave the following modified version of CALCRIM No. 852, which instructed the jury regarding its consideration of the propensity evidence of Morales's prior acts of domestic violence that the prosecution presented under section 1109:

"The People presented evidence that the defendant committed domestic violence that was not charged in this case.

"*Domestic violence* means abuse committed against an adult who is a spouse.

"*Abuse* means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the

25

defendant was likely to commit and did commit the crime charged in this case or a lesser crime.

"If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty. The People must still prove each charge and allegation beyond a reasonable doubt."

B. *Analysis*

Our Supreme Court has explained that, "'[g]enerally, a party may not complain on appeal that an instruction *correct in law* and responsive to the evidence was too general or *incomplete* unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 (*Guiuan*), italics added.)

Here, Morales does not challenge the correctness of the instructions the court gave under CALCRIM Nos. 375 and 852. Rather, he essentially complains that the instructions were too general or incomplete, and that the court should have provided clarifying instructions that would have given the jury additional guidance. Morales acknowledges he did not object to the court's instructions and failed to request clarifying instructions. Accordingly, we conclude Morales forfeited his claim of instructional error because he did not request that the court give clarifying instructions. (*People v. Valdez* (2004) 32 Cal.4th 73, 113 ["Defendant did not request the clarifying language he now contends was crucial and may not now 'complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete.'"]; *Guiuan*, *supra*, 18 Cal.4th at p. 570.)

26

DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

McINTYRE, J.